73 N.J. Super. 285 (1962)
179 A.2d 754
ARLIE KEIFFER, PLAINTIFF-RESPONDENT,
v.
FOOD PRODUCTS TRUCKING CO., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 23, 1961.
Decided March 27, 1962.
*289 Before Judges GOLDMANN, FOLEY and LEWIS.
Mr. Albert M. Neiss argued the cause for appellant.
Mr. George J. Sokalski argued the cause for respondent (Mr. Bernard M. Kimmel, on the brief).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendant appeals from a Law Division judgment entered in plaintiff's favor upon a jury verdict, as well as from the denial of its motion for a new trial.
Plaintiff sued to recover alleged underpayments for trucking services rendered defendant company during the years 1952 through 1956, as well as damages resulting from what he claims was his wrongful discharge from its employ. The jury returned a general verdict of $3,203.45 in plaintiff's favor for the underpayments. This figure reflected the several sums it found to be due him in its answers to interrogatories making up its special verdict. The jury found in defendant's favor on the wrongful discharge issue. An accordant judgment was entered.
Defendant then moved for a new trial. The motion was denied, but the trial court reduced the judgment to $2,651.85 in order to correct certain errors discovered in one of the items of the special verdict. Defendant appeals from the money judgment as well as from the order denying its motion for a new trial. Plaintiff does not cross-appeal.
Defendant trucking company, a contract carrier with Interstate Commerce Commission rights, had a contract with Food Fair Stores to transport groceries and produce. Plaintiff leased his truck  at first a "straight" truck and later, after March 1956, a tractor-trailer  to defendant under oral contracts from 1952 through 1954, and under *290 written contracts in 1955 and 1956. Plaintiff agreed, among other things, to operate the leased truck. In return he was to receive a designated percentage of the "revenue earned" by defendant from Food Fair.
Plaintiff's claim of having been underpaid was based on allegations that defendant improperly charged Food Fair, the contract shipper, in five specific categories. The fifth of these need not detain us. It involved a claim that defendant had actually received from Food Fair 8¢, and not 7¢, per hundredweight for the intrastate transportation of groceries. Defendant does not contend that the jury's special verdict on this item was incorrect. We may therefore consider this phase of the appeal abandoned.
Defendant argues four main points: (1) the trial court erred in denying its motions for judgment at the close of plaintiff's case and the entire case; (2) the court erred in denying its motion for a new trial; (3) errors in the admission of evidence contributed to the jury verdict, making it inconsistent with substantial justice; and (4) the trial court committed legal errors in its charge.

I.
Plaintiff's first claim was that defendant in specific instances improperly billed Food Fair at the TL (truckload) rate, rather than at the higher LTL (less than truckload) rate for groceries shipped in interstate commerce. This, he says, resulted in his being underpaid.
The TL rate, specified in the ICC schedule filed by defendant, is designed to provide a cheaper rate for one who ships in quantities of 23,000 pounds or more. Plaintiff's expert witness, George A. Olson, testified that if Food Fair shipped a load of more than 23,000 pounds interstate by defendant, and defendant divided the load among several contract truckers so that each picked up and carried less than 23,000 pounds, the TL rate would apply. Defendant's expert, Bort H. Collins, corroborated this; it was the weight of the shipment tendered defendant by the shipper (Food *291 Fair), rather than the weight actually carried by an individual trucker after the original load was divided up, that determined which rate was applicable.
With regard to the TL vs. LTL rate, we have in the past had occasion to state that the differentiation between truckload and less than truckload shipments was obviously designed to provide a cheaper rate for one who ships in large quantities. For a carrier to break down a large shipment into smaller ones  for its own convenience and to suit available equipment  and then charge the shipper on the basis of several partial shipments, would not only thwart the purpose of the rate differential but would unquestionably result in the shipper's soon looking elsewhere for a carrier. The ICC schedule does not compel such an illogical and impractical conclusion, and there is no reason why it should be inferred.
It was plaintiff's burden to establish a prima facie case by showing that the less than 23,000-pound loads for which he claims he was underpaid because defendant charged Food Fair the lower TL rate, were the very loads which Food Fair initially turned over to defendant for interstate carriage. Plaintiff produced a two-page summary (Ex. P-3) listing alleged loads of under 23,000 pounds for which he had been paid on the basis of the TL rate. These represented loads carried from New Jersey to New York City and Brooklyn. However, he failed to present any evidence whatever of the weight of the shipments which Food Fair had originally turned over to defendant. The weight of these shipments was the determinant, under what we have previously said on the subject (see preceding paragraph) as well as the uncontroverted testimony of the two ICC experts, Olson and Collins. The trial court could well have granted defendant's motion at the close of plaintiff's proofs for failure to establish even a prima facie case. It took a more conservative course and heard the entire case. Cf. Advance Piece Dye Works, Inc. v. Travelers Indemnity Co., 64 N.J. Super. 405, 415 (App. Div. 1960).
*292 Its motion denied, defendant proceeded to present substantial and uncontroverted proof that Food Fair never gave it a load weighing less than 23,000 pounds to be carried in interstate commerce from New Jersey to New York. One of the four witnesses who so testified, Arthur Jones, pointed out that on occasion there were pick-up orders in New York for delivery to the warehouse in Linden. These pick-up loads might weigh over or under 23,000 pounds, and in the latter case defendant would charge Food Fair the LTL or higher rate. This is confirmed by plaintiff's own exhibit P-4, showing such pick-ups in Brooklyn or New York for the Linden warehouse. He conceded the correctness of the payments for these loads.
At the close of the entire case defendant renewed its motion for judgment, based on plaintiff's failure to establish the size of the orders tendered by Food Fair to defendant for delivery from New Jersey to New York. The motion was denied, and wrongly so. Not only had plaintiff failed to establish a prima facie case, but defendant had additionally shown that the loads Food Fair gave defendant to be carried to New York all exceeded 23,000 pounds.
Recognizing, as we must, that on a motion for judgment  as on a motion at the close of plaintiff's case  the trial court must accept plaintiff's proofs as true and give him the benefit of every legitimate inference that might reasonably be drawn therefrom, we are convinced that there was no factual question to go to the jury on this phase of the case. There were no facts that would logically support even an inference that what plaintiff carried on any trip from New Jersey to New York was the complete order which Food Fair gave defendant. Indeed, the proofs eventually were all the other way; Food Fair's complete orders were always in excess of 23,000 pounds.

II.
Plaintiff's second claim was that the intrastate produce he carried was improperly billed by defendant to Food Fair *293 at $25 the load  the rate these companies had agreed upon between themselves. The correct billing, he maintains, should have been $35 because he and defendant had agreed that the interstate rate set out in the ICC schedule should apply. Defendant, on the other hand, contends that rates in the tariff filed with the ICC could not possibly be applied to intrastate shipments of produce; that defendant and Food Fair had the right to contract at any price, and that plaintiff was compensated on the basis of the price agreed upon between defendant and Food Fair.
Defendant points to the absence of any proof that plaintiff ever carried a single load of produce in interstate commerce. Plaintiff's attorney admits this, and our own reading of the record confirms it. Defendant also contends, as it did when it moved for judgment, that plaintiff's expert, Olson, admitted that the ICC schedule governed only interstate commerce, that there was no controlling New Jersey regulation, and that defendant was free to contract with Food Fair for whatever rate was thought proper for the intrastate carriage of produce.
The question is not the applicability of the ICC rate. Clearly, ICC could not regulate the intrastate commerce here involved. Rather, the question is: What were the terms of the agreement entered into between plaintiff and defendant with regard to such intrastate shipments? Our review of the record convinces us that the resolution of this controverted issue was properly left to the jury for determination.
Plaintiff testified that when he first spoke to Arthur Jones, defendant's representative, about trucking, Jones had said in the presence of Michael Cuozzo, another contract trucker, that "he [i.e., defendant] had the ICC license and I [plaintiff] will receive eighty five percent of the monies received from Food Fair." Cuozzo testified that Jones had told plaintiff he was to be paid "under ICC rates," and "The base figures were to be taken from ICC rights." Plaintiff was to be paid at the same rates as Cuozzo, and these were based on the ICC tariff. Cuozzo further testified that *294 he had received the same rate for a shipment of produce wholly within the State as when he carried produce outside the State.
Plaintiff's expert explained that the inclusion of an exempt item like produce, in a tariff of items over which the ICC had no control, was a practice often used when the framer of the tariff wanted to protect a rate rather than make a new rate on every shipment. Asked if there was any ICC rule or regulation which would prevent a shipper like Food Fair and a trucking company like defendant from including in their tariff a schedule of rates and scope of operating rights covering exempt items, such as produce, fish and dairy products, Olson replied that there was not.
The testimony makes clear that the parties to this action were entirely free to agree that ICC rates were to apply to intrastate shipments. In the light of the testimony of plaintiff, Cuozzo and Olson, enough of a factual issue was created as to the rate defendant had agreed to pay plaintiff for intrastate shipments of produce to create a jury question. Where reasonable minds may entertain different views as to the truth of the evidence adduced, the factual issue must be resolved by the jury. Koch v. LaPorta, 30 N.J. Super. 388, 391 (App. Div. 1954); cf. In re Perrone, 5 N.J. 514, 521-22 (1950); Ferdinand v. Agricultural Ins. Co., etc., 22 N.J. 482, 490-1 (1956).
Applying the rule relating to motions for judgment, noted above, there was sufficient affirmative evidence presented by plaintiff for the trial court to have left it to the jury to determine whether, as plaintiff claimed, the parties agreed to apply the ICC tariff rate to intrastate produce shipments.

III.
Plaintiff's third and fourth claims relate to underpayments for the trucking of dairy products and frozen foods. Since the same considerations are involved, we shall, as did the parties, deal with these matters under a single point. *295 Any reference by us to dairy products may be considered as also relating to frozen foods.
Plaintiff claimed that for the period between November 14 and December 31, 1955, defendant should have billed on the basis of $35 a load, instead of $31. Further, that for 1956, after he had changed from a "straight" truck to a tractor-trailer, defendant should have billed on the basis of $55 per trailer load instead of $40. Defendant's position, on the other hand, was that the correct payment for a "straight" truck was on the basis of $40, not $35, and plaintiff had actually been paid on the basis of $40 when he received a net of $31. The $9 difference, it explained, was made up of its 15% share of the $40 and an estimated $3 advanced for tunnel and bridge tolls.
(Plaintiff, it should be noted, had stipulated that the 1955 rate for dairy products was $35. The stipulation was incorrect, the rate actually being $40. The trial court held plaintiff bound by his stipulation, and he does not contest the ruling.)
In arguing that plaintiff received all he was entitled to for 1955 by being paid $31 net, defendant stresses the testimony of Arthur Jones, who said that for the November 14-December 31 period in question defendant could not, by reason of an ICC regulation, pay on the basis of $40, but had to pay net. It also points to an exhibit (P-1) showing that just before November 14 plaintiff was paid on the basis of $40 less the indicated deductions, but after that date a flat $31 per load. However, the page of the exhibit showing $31 the load is not in itself determinative of the factual issue in defendant's favor. Plaintiff testified that he was paid on the basis of $31 per truckload, so that he was underpaid by $4, the difference between $35 (the stipulated rate) and $31.
The ICC ruling which defendant claims made necessary the change to a net figure basis, was never identified during the trial. The trial court characterized this aspect of the proofs as "most uncertain," and concluded that the *296 jury could well have declined to credit defendant's explanation. We agree that the jury could rightfully reject it and find, as it obviously did, that plaintiff was paid on a $31 rather than a $35 basis at the end of 1955, and therefore had been underpaid $4 per truckload of dairy products. Since credibility was involved, the factual question was properly left for resolution by the jury.
As for defendant's claim of having been underpaid for dairy products and frozen food carried in 1956, the evidence disclosed that defendant had billed on the correct basis of $40 and not $55, since plaintiff had not used his tractor-trailer from January through March, the period involved. In its special verdict the jury included supposed underpayments for this period where, admittedly, none could properly be claimed. The trial judge cured the defect by way of remittitur, to be considered under point IV.

IV.
Defendant claims error in the denial of its motion for a new trial. On such a motion in an action tried to a jury, the trial judge may not set aside the verdict as against the weight of the evidence unless, after giving due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears to him that the verdict was the result of mistake, partiality, prejudice or passion. R.R. 4:61-1(a). And R.R. 1:5-3(a) directs that on a review of any cause involving issues of fact determined by a jury, the verdict shall not be set aside unless, having given due regard to the opportunity of the trial court and the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice or passion. Defendant concedes, as it must, that an appellate tribunal should not attempt to invade or usurp the jury's function where the jury has passed upon competent but conflicting evidence, unless the *297 result is so contrary to the weight of the evidence that the court can come to no other conclusion but that it was the result of mistake, partiality, prejudice or passion. Hager v. Weber, 7 N.J. 201, 210 (1951), affirming 8 N.J. Super. 252 (App. Div. 1950); and see Hartpence v. Grouleff, 15 N.J. 545 (1954), reversing 28 N.J. Super. 125 (1953).
Defendant characterizes the trial as "lengthy, complicated and confusing." Lengthy it was, and perhaps a bit complicated, but we cannot say it was "confusing." Trial courts and juries frequently deal with lengthy and complicated cases, but it need hardly be said that this is any reason for depriving a litigant of his right to have the factual dispute determined by a jury. Longo v. Reilly, 35 N.J. Super. 405, 410 (App. Div. 1955), certification denied 25 N.J. 45 (1957). Our judicial system provides methods whereby the trial court may guide the jury in such a way as to minimize any confusion as to issues and findings. Under R.R. 4:50-1 the trial judge may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. And under R.R. 4:50-2 he may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact, the decision of which is necessary to a verdict. The latter method was used by the trial court to good advantage in this case.
At the argument of the motion for a new trial, plaintiff's counsel conceded that the claim of underpayments for frozen foods and dairy products carried in the early part of 1956 was mistakenly brought. Defendant contends that since the jury included the claim in its answer to the interrogatory dealing with this phase of the case, there is a clear demonstration that the jury's determination of liability was the result of mistake on its part, exhibiting a lack of understanding of the legal and factual issues involved.
The case was submitted to the jury on a list of interrogatories based on stipulated sums, which were given to and *298 accepted by the jury. It was told that the amount claimed for underpayments of frozen foods was $404 maximum. (Parenthetically, we observe that this was made up of a claim of $68 for the close of 1955 and $336 for early 1956). The stipulated amount given to the jury for dairy products was $280.40. This figure was clearly incorrect, since the parties agree that the amounts involved were $74.80 for 1955 and $105.60 for 1956, a total of $180.40.
On the motion for a new trial the trial judge exercised the power of remittitur to make necessary corrections in this part of the jury's verdict. He first eliminated the $336 for frozen foods and $105.60 for dairy products, carried in 1956, since it was conceded that these claims were unfounded, based as they were on plaintiff's mistaken notion that he had used his tractor-trailer in transporting the goods when, in fact, he had used his "straight" truck. The trial judge also eliminated the $100 error which had crept into the addition of the amounts claimed for carrying dairy products. What the trial court did was entirely correct and did not entitle defendant to a new trial.
When, pursuant to R.R. 4:50-2, a matter is submitted to a jury in the form of a general verdict accompanied by interrogatories which are specifically answered by it, the court knows upon what underlying facts it based its decision and is able to localize and correct errors. Terminal Construction Co. v. Bergen County, etc., District Authority, 18 N.J. 294, 319 (1955); Marchese v. Monaco, 52 N.J. Super. 474, 485 (App. Div. 1958). The items relating to dairy products and frozen foods were clearly separable from the other issues in this case. In answering the interrogatories submitted to it by the trial court, the jury clearly showed that each category of plaintiff's claims was separately considered. The record shows that the claim for these items was presented in two parts, one covering the end of 1955 and the other the beginning of 1956. The amounts involved for each year were stipulated. Accordingly, the trial judge, finding there was no basis for the jury to award anything to plaintiff for *299 the year 1956, could and did easily correct the error by simply deducting the stipulated amounts of $336 for frozen foods and $105.60 for dairy products from the total amount of the verdict. He obviously could also make a correction for the $100 error in addition which he, as well as counsel, had overlooked.
We conclude that the errors do not reflect mistake, partiality, passion or prejudice such as would infect the entire verdict. In his memorandum opinion denying a new trail, the trial judge said that the jury's response to the written interrogatories, and its request during its deliberations for a breakdown of the various items claimed, "bespoke an intelligent consideration of the issues involved and appreciation of their importance." We join in that conclusion.

V.
Defendant cites three instances where the trial court allegedly committed reversible error in the admission of evidence: (1) as to the scope of the area involved in defendant's ICC rights; (2) as to whether ICC rates could be made to apply to intrastate shipments; and (3) as to the rate to be applied if a truck carried less than 23,000 pounds.
Defendant claims that the testimony concerning the scope of the ICC rights was "complicated, confusing and unnecessary"; it was not relevant or material to the issues in the case, and its admission prejudiced defendant's cause. We consider the testimony to have been relevant to the issues involved. In any event, its admission was not inconsistent with substantial justice.
It will be recalled that plaintiff introduced evidence to establish that defendant agreed to pay him the same rate for intrastate as for interstate shipments of groceries. It therefore became necessary and important to determine the exact scope of defendant's ICC rights, particularly in light of the testimony of defendant's expert indicating that such *300 rights could cover shipments to points wholly within the State if the ultimate destination was interstate. There was also some testimony that Staten Island, N.Y., could be considered an excluded area, and therefore not deemed to be interstate. The evidence as to scope was therefore of some help to the jury in determining whether the ICC rates were applicable to plaintiff's services in carrying groceries intrastate. The evidence might, perhaps, be considered complex, but it was not unnecessary, and no error was committed in admitting it.
Defendant next contends that the following testimony of plaintiff's expert, Olson, should not have been permitted:
"Q. Mr. Olson, are there any rules or regulations of the I.C.C. Interstate Commerce Commission, which would prevent a shipper such as Food Fair Stores and a trucker, such as Food Products Co., from including in their tariff a schedule of rates and scope of operating rights, concerning the exempt items of produce, fish, dairy products, butter and eggs?
A. No, there is not."
The question had just been put in another form and had been reframed at the trial judge's suggestion after defendant's counsel had objected to the use of the words "would prevent." Objection to the question as reframed was not made until after it had been answered. Defendant made no motion to strike the question and answer. A party may not take advantage of an objection not made until after the question was answered, absent a motion to strike the answer or to instruct the jury to disregard it. Prout v. Prout, 82 N.J.L. 537, 538 (E. & A. 1911). But that aside, the very next question propounded to the witness was answered without any objection on defendant's part:
"Q. Mr. Olson, it is my understanding that this type of inclusion in a tariff is permissible? Is that so?
A. That is correct."
In considering defendant's contention, what was said by Chief Justice Case in Kaplan v. Meranus, 136 N.J.L. *301 425, 427 (Sup. Ct. 1948), affirmed o.b. 1 N.J. 219 (1948), is entirely apposite:
"The fourth point goes to a reason assigned by the judge in refusing to overrule a question. The question had been answered before the ruling was made, and there was no motion to strike. The purport of the question and answer was clear from other testimony. The very next question  which was not objected to  and the answer elucidated the matter fully. Moreover, the exception upon which the point rests was to the allowance of the question, not to the stated reason for the ruling. The point does not present prejudicial error."
The question propounded to Mr. Olson was to establish the fact that there was no ICC rule or regulation preventing parties from applying the rate set forth in the schedule to intrastate shipments. The question was a proper one.
On cross-examination of defendant's expert, Collins, he was asked:
"Q. Now, Mr. Collins, is it possible that the parties can use that tariff, you call it a schedule of rates, for intrastate shipments?"
Defense counsel objected to the use of the word "possible," saying, "The fact that we could have done this means nothing." The court permitted the question and the witness answered:
"A. This schedule may be applied as may other practical means and determinations of the applicable rate."
Defendant argues that the question called for mere guess or speculation on the part of the witness, and that any inference the jury might have drawn that the parties did indeed use the ICC rates for intrastate shipments would be based on conjecture or guess, citing Long v. Landy, 35 N.J. 44, 54 (1961). The context in which the question was asked reveals that plaintiff was attempting to prove that although the ICC tariff could not regulate or prescribe intrastate rates, there was nothing in the tariff to prevent *302 parties from agreeing that the rates should apply to intrastate shipments. The witness, in fact, had just stated that parties "can do anything they want" in setting up the intrastate rates.
The line of questioning pursued with Collins, like that in the case of plaintiff's expert, Olson, was obviously for the purpose of providing a foundation for other evidence adduced by plaintiff showing that the parties had in fact agreed to use the ICC rates for intrastate shipments. The disputed testimony merely indicated that the parties were free to do this. The jury was not left to speculation or guess, and it is difficult to grasp defendant's objection that substantial injustice was visited upon it by the trial court's ruling.
Defendant's final contention under this head of the appeal is that plaintiff's expert was permitted to answer a hypothetical question not based upon facts brought out in the evidence. The question was:
"Q. Now, I ask you, if a truck on September 3, 1952, travelled between Linden and Brooklyn or vice versa, Brooklyn and Linden and carried 19,600 pounds, what would be the correct rate per hundred weight?"
We find no merit in the objection. The testimony adduced by plaintiff established every fact which the expert was asked to assume.
It would appear from the objection defendant made at the time the question was asked that counsel wanted the question to include the size of the original order Food Fair gave defendant. The trial court observed that the question included the facts then in the case, and instructed defense counsel that he was free to ask a second hypothetical question on cross-examination, which would include facts he thought he was going to establish.
A question as to the weight of the original order was asked of plaintiff's expert later in his testimony, at which time he said that the LTL rate would apply and that "in *303 order to change my opinion I would have to see a bill of lading between * * * Food Fair Stores, Inc. and Food Products Trucking Co." When the court asked for further explanation, the expert replied:
"* * * If the truck load rate were to be applied I would have to see the bill of lading covering the entire movement for Food Fair Stores given to the carrier Food Products to show that the bill of lading contained more weight than 23,000 pounds, in order to apply the truck load rates."
In any event, we find defendant suffered no substantial injustice, even if it would have been better for plaintiff to have included the original shipment weight in the question under attack. In addition, this final objection to the admissibility of evidence concerns the TL vs. LTL rate. This matter was determined in defendant's favor earlier in the opinion.

VI.
Defendant's final argument concerns itself with alleged errors in the charge to the jury. Its argument falls under four subheads:
1. Plaintiff's attorney, in summation, incorrectly stated the law applicable in the TL vs. LTL issue. The complaint is that although the trial judge charged to the contrary (and correctly), he did not specifically correct the misstatement made by plaintiff's attorney, so as to achieve "real clarity."
The charge on this phase of the dispute was quite accurate and should have fully guided the jury in its deliberation. Moreover, as just noted, we have decided the TL vs. LTL claim in defendant's favor, so that further discussion becomes unnecessary.
2. Defendant's next claim is that the trial judge told the jury of plaintiff's claim that the ICC schedule should apply to intrastate shipments of groceries, but failed *304 to mention any of defendant's contentions on this issue. The jury was instructed that for plaintiff to recover, it had to find that defendant agreed to pay the same rate for both interstate and intrastate shipments; that it must find that defendant agreed that the ICC scheduled rates should apply to intrastate shipments; and that there was nothing in the law which would prevent the making of such an agreement. On the other hand, the jury was told of defendant's contention that plaintiff was paid everything he was entitled to; that it claimed that the ICC schedule was to apply to interstate shipments only; and that it contended plaintiff was to receive a percentage of the amount which defendant received for handling Food Fair traffic. In our view, the charge, read in its entirety, demonstrates that the trial judge fairly and adequately covered the contentions of both sides, and that the jury was well instructed.
3. Another of defendant's exceptions to the charge was addressed to the trial court's failure to mention the issues and contentions with regard to dairy products and frozen foods. The trial judge indicated generally that one of the issues was that defendant charged Food Fair less than the applicable rate for frozen foods and dairy products, and plaintiff was paid on the basis of this rate rather than the rate he claims should have been used. After deliberating for a while the jury returned to the courtroom and asked what was the basis of plaintiff's claim for carrying frozen foods and dairy products. The trial court answered:
"The Court: Well, briefly the claim of the plaintiff is that between November 14, 1955 and December 1, 1955 the plaintiff was paid for each of these products on the basis of $31 instead of $35 which the plaintiff says it should have been, and that in the period of 1956 up to March 9 payment was made on the basis of $40 whereas the plaintiff claims that it was $55. Now, the parties have examined slips that are in evidence as P-1 in this case for the purpose of determining how much those claims, if they were good and full, would amount to, and I have given you the total, $404 on one, and $280 on the other. Does that explain it to you?" *305 Defendant's failure to except to the trial court's supplemental charge bars it from urging the matter as a ground for error on appeal, R.R. 4:52-1. The fact that the trial judge left to the jury the determination of the factual issues regarding dairy products and frozen foods without commenting in detail on the factual position taken by either side, does not constitute reversible error.
4. Finally, defendant urges error in the trial court's submission to the jury of the opinions of the respective experts, and cites a number of cases, including Carlo v. Okonite-Callender Cable Co., 3 N.J. 253 (1949); Brinkmann v. Urban Realty Co., Inc., 10 N.J. 113 (1952); and Maryland Casualty Co. v. Hearn, 46 N.J. Super. 482 (App. Div. 1957), for the proposition that ICC rules and regulations were entitled to judicial notice. From this it is argued that the trial court should not have left to the jury the determination of which expert's opinion was to be accepted as controlling.
In the first place, no specific rule or regulation was ever pleaded or even presented to the court. Secondly, there was no ICC rule or regulation to be construed here, but only a resolution of the difference of the opinions of the experts as to whether the parties were to be bound by the rates set up in the ICC schedule. The resolution of these expert opinions was a proper subject for jury consideration.
Our attention has also been called to the fact that in the course of the charge the court, when referring to intrastate shipments of produce, used the word "interstate." This was obviously a slip of the tongue. We cannot remove a single word from context; the charge must be considered as a whole, and so read we find it accurate and not misleading.
In view of the answers the jury gave to the interrogatories posed by the court, plaintiff's claim for underpayments because the TL instead of the LTL rate was used, can readily be deducted from the total award made by the jury. The matter is remanded to the trial court for correction of the award in this respect. The judgment is otherwise affirmed.