212 N.J. Super. 6 (1986)
512 A.2d 1142
JOHN J. KENNEY AND MARY C. KENNEY, HIS WIFE, ET ALS., PLAINTIFFS,
v.
SCIENTIFIC, INC., ET ALS., DEFENDANTS.
Superior Court of New Jersey, Law Division Middlesex County.
Decided January 13, 1986.
*8 Clyde A. Szuch for 101 defendants-"generators" (Pitney, Hardin, Kipp & Szuch, attorneys).
Thomas J. Pryor for 9 defendants-"generators" (Hoagland, Longo, Oropollo & Moran, attorneys; Michael B. Oropollo on the brief).
David J. Novack for several defendants-"haulers" (Budd, Larner, Kent, Gross, Picillo, Rosenbaum, Greenberg & Sade, attorneys).
Steven T. Singer for several other defendants-"haulers" (Schwartz, Tobia & Stanziale, attorneys).
Michael J. Herbert and Richard M. Hluchan for defendants-"owner/operators" (Sterns, Herbert & Weinroth, attorneys).
Howard Mankoff for several defendants-"governmental groups" (Greenberg, Margolis, Ziegler, Schwartz, Dratch & Fishman, attorneys).
Thomas J. DiChiara for plaintiffs (Drazin & Warshaw, attorneys).
*9 JOELSON, J.S.C. (retired and temporarily assigned on recall).
In this extraordinarily complicated case which will take uncommonly long to try, 106 plaintiffs have filed demands for trial by jury. Although many of the approximately 625 original defendants filed similar demands, most of them have now joined in the motions by Pitney, Hardin, Kipp & Szuch on behalf of 101 defendants alleged to have generated toxic wastes sent to a landfill, and by Sterns, Herbert & Weinroth, attorneys for the owners/operators of the landfill, to strike plaintiffs' demands for a jury trial. The only defendants, including third-party defendants, opposing the motions are 9 generators represented by Hoagland, Longo, Oropollo & Moran. Counsel representing the 25 haulers, although not directly opposing the motions, contend that a determination of the issue by this court would be premature at the present time. For the reasons to be expressed hereinafter, the motions to strike the demands for a jury trial will be granted.
In order to set forth these reasons, it is necessary to review in detail the nature and history of the case now under consideration. The 106 plaintiffs reside in the vicinity of landfills located in the Township of Edison. One of these landfills, Kin-Buc, is privately owned and operated. Another landfill adjoining Kin-Buc is owned and operated by the Township of Edison. Plaintiffs allege that because of the manner in which Kin-Buc dealt with toxic wastes, they suffered various physical and emotional disabilities and also property damage. Concerning the landfill of the Township of Edison, the complaint alleges that the township owned and operated its landfill near Kin-Buc, "thus further saturating the earth and causing additional percolation and/or complicating the hydrogeological conditions of the general area." Plaintiffs have brought their actions against the owners and operators of the landfills as well as against 525 private enterprises and six public entities which allegedly generated the toxic wastes hauled to Kin-Buc and against 25 *10 haulers which transported the waste to Kin-Buc.[1] There have been many inter-group crossclaims for contribution and indemnification, i.e., generators against owner/operators of the landfill, generators against haulers, haulers against generators, etc.
To complicate further an already complicated matter, there has been a third-party action filed by the private owner/operators. This action has brought in 36 third-party defendants alleged to have "discharged hazardous, toxic or abnormally dangerous substances, pollutants and contaminants into the air, surface waters near the Kin-Buc Landfill in Edison, New Jersey, and the Raritan River, causing plaintiffs to be exposed to these hazardous, toxic or abnormally dangerous substances, pollutants and contaminants and proximately causing such injuries and damages as were sustained by the plaintiffs." This third-party action has also spawned numerous cross-claims, and has caused plaintiffs to add the 36 third-party defendants as new direct defendants. One of these third-party defendants and new direct defendants is a landfill across the Raritan River from Kin-Buc. According to an, as yet, unsubstantiated assertion of plaintiffs' counsel, that landfill (Edgeboro Disposal, Inc.) worked under some kind of arrangement whereby at times it accepted toxic wastes from Kin-Buc.
The court believes that the foregoing description of the nature and history of the matter justifies the statement hereinabove that we are dealing with an extraordinarily complex case, the entire trial of which will be uncommonly lengthy. It is reasonable to estimate that the trial will take from six months to a year or more, exclusive of deliberations which will also be unusually time-consuming. In Kenney, et als. v. Scientific, *11 Inc., et als., 204 N.J. Super. 228 (Law Div. 1985), this court stated that it would be desirable that because of the complexity of the case, it be divided into a series of separate trials. Although still of the opinion that such a course would be desirable, the court upon further consideration has concluded that a procedure of fragmented individual trials would not be feasible, as it would entail much overlapping and repetitive testimony at each segment. All aspects of liability and crossclaims for contribution and indemnification are so inter-related and interwoven that successive juries would have to know what had transpired before in order to achieve an understanding of the fragmented issue which they would be called upon to resolve.
Of course, it is not uncommon for there to be bifurcated trials as to liability and damages. However, even such bifurcation could pose difficulty in this case. All plaintiffs seek punitive damages against all defendants. Although generators which are public entities are immune under N.J.S.A. 59:9-2c from the award of punitive damages, all other defendants enjoy no such immunity. Thus, if the trier of fact should determine under Berg v. Reaction Motors Div., 37 N.J. 396, 413 (1962) that "there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences," id. at 414, punitive damages may be imposed upon such non-public entity defendants. Although the test for the award of punitive damages is a demanding one, such damages may be awarded against a defendant who has displayed "such a conscious and deliberate disregard of the rights of others that his conduct may be called willful or wanton." Prosser & Keeton, Torts (5 ed. 1984), § 2 at 9-10.
In the event the trier of fact as to liability should decide that punitive damages should be granted, then the new trier of fact in the bifurcated damages trial would be required to decide how large an award is sufficient in order to punish a given defendant. However, this could not be accomplished unless the new trier of fact be apprised of all the underlying circumstances *12 which formed the basis of the conclusion of the first trier of fact that punitive damages should indeed be awarded. This would entail a repetition of the testimony already adduced. It would also entail an examination into the financial status of each defendant in order to determine how large a verdict should be in order to constitute adequate punishment. Leimgruber v. Claridge Associates, Ltd., 73 N.J. 450, 458 (1977).
These difficulties would not arise if the first trier of fact should deny punitive damages, but even a bifurcated trial on damages of only a compensatory nature would take a very long time because 106 plaintiffs would have to prove their separate damages. To break down the damages aspect by having a separate trial for each plaintiff or cluster of plaintiffs in order to protect jurors from the hardship of months of service would require numerous jury selections, thereby needlessly consuming the time of all concerned, including the court system. Furthermore, even though under R. 1:8-3(c), "[p]arties represented by the same attorney shall be deemed 1 party" for the purpose of peremptory challenges, there would still be an unusually large number of peremptory challenges because of the large number of attorneys in this case. Since there are 154 lawyers representing defendants or groups of defendants, and since R. 1:8-3(c) would allow each attorney six peremptory challenges, each trial for damages would entail 930 peremptory challenges, including those of plaintiffs, if liability is found to be established against all defendants. Furthermore, under R. 1:8-3(c) the number of such challenges would not diminish, if liability should not be established against a given defendant, if the attorney for that successful defendant remains in the case as counsel for another defendant or defendants.
It should also be mentioned that bifurcation as to liability and damages would bring about overlapping witnesses. In the trial on liability, plaintiffs will be obligated to prove a causal connection between their alleged physical ailments and the toxic substances stored, generated or hauled by the various defendants. Thus, testimony of medical experts will be produced at *13 the liability trial concerning the nexus between the physical ailments and the toxic substances. The testimony of these same medical experts will be needed as to damages because these experts will have to testify about treatment rendered, disability incurred, and the reasonable probability of disability and treatment in the future. See Coll v. Sherry, 29 N.J. 166, 174-175 (1959). This overlapping can be avoided if there is no bifurcation.
This court trusts that its discussion will clearly reveal that in granting the motion to strike the demands for trial by jury, it has no intention of flouting constitutional requirements, but believes that constitutional provisions must be interpreted in such a manner as to conclude that a jury trial is not constitutionally mandated, regardless of circumstances, in every civil case where the amount in controversy is above a given amount.
The Seventh Amendment to the United States Constitution provides that in suits "at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." In Morin v. Becker, 6 N.J. 457, 462 (1951), Chief Justice Vanderbilt writing for the court declared that "sovereign states ... are not subject to the Seventh Amendment." However, that question is rendered academic by reason of Article I, paragraph 9 of the 1947 New Jersey Constitution which provides that "[t]he right of trial by jury shall remain inviolate."
It is well established that "[t]he right of trial by jury protected in each of our [New Jersey] Constitutions is the right as it existed at common law and remained on July 2, 1776." Montclair v. Stanoyevich, 6 N.J. 479, 485 (1951). To the same effect, see also Manetti v. Prudential Property & Cas. Ins. Co., 196 N.J. Super. 317, 320 (App.Div. 1984); Peterson v. Albano, 158 N.J. Super. 503, 506 (App.Div. 1978). In Longo v. Reilly, 35 N.J. Super. 405, 410 (App.Div. 1955), in what should be regarded as dictum, the Appellate Division stated that "the complexity of a factual controversy does not derogate from the *14 right of an aggrieved person to prosecute his cause at law and have a jury pass upon the issues of fact where legally appropriate." Seizing upon this dictum, a later Appellate Division panel, in what may also be fairly characterized as dictum of its own, stated that the complexity or length of a trial is not "reason for depriving a litigant of his right to have the factual dispute determined by a jury." Keiffer v. Food Products Trucking Co., 73 N.J. Super. 285, 297 (App.Div. 1962), certif. den. 37 N.J. 524 (1962). Finally, citing Longo, supra, and Keiffer, supra, another panel brought forth still more dictum, stating that "neither complexity nor length of trial is sufficient to deprive a party of a jury trial if he is entitled to it as a matter of right." Van Dissel v. Jersey Central Power & Light Co., 181 N.J. Super. 516, 524 (App.Div. 1981), certif. den. 89 N.J. 409 (1982), vacated on other grounds 465 U.S. 1001, 104 S.Ct. 989, 79 L.Ed.2d 224 (1984).
This court is now considering a case involving 106 plaintiffs and 661 defendants, including those added as new direct defendants as a result of the third-party action. Plaintiffs have asserted variegated claims against several different groupings of defendants, which in turn have filed many crossclaims against one another. Surely, such a cause of action was unknown procedurally to the common law.
There is pertinent and probing treatment of this subject: King, "Complex Civil Litigation and the Seventh Amendment Right to a Jury Trial," 51 Chi.L.Rev. 581 (1984). Although it deals with the Seventh Amendment to the United States Constitution rather than Article I, paragraph 9 of the New Jersey Constitution, it is equally persuasive as to both of these documents. Almost at the outset, the author remarks:
The last fifty years have seen a tremendous liberalization of civil procedure and an unprecedented proliferation of new causes of action, which together make it possible for civil litigation to reach a level of complexity exceeding anything imaginable in the common law courts of 1791. [Ibid.]
The author then proceeds to a statistical analysis of "all of the reported cases in the major English common law trial *15 courts during the years 1789 to 1791, the period from the ratification of the [United States] Constitution to the ratification of the Seventh Amendment," id. at 590, stating the purpose of the analysis to be "to examine the actual complexity of lawsuits during this period as an aid in ascertaining the framers' conception of `Suits at common law.'" Ibid. The statistical analysis demonstrates that a case with the multiplicity of parties and issues such as presently confronts this court was unknown at common law. Thus, the following excerpt from the Chicago Law Review article is particularly compelling:
In most cases, the current doctrine's focus on the "substantive" aspects of the case, the remedies and rights, may be appropriate. It is, however, futile to assume that an unwavering line can be drawn between substance and procedure. More importantly, it flies in the face of a claimed reliance on history to conclude that, in an action involving, for example, over 100 parties contesting eighteen consolidated class actions, with cross claims so numerous as to require a five-page chart merely to list them and a trial expected to last two years and involve about 500 witnesses and 24,000 documents, a jury is constitutionally required simply because the plaintiffs seek money damages, a remedy traditionally granted at law. When one considers that the modern rules on class actions, discovery, and joinder of parties and claims are all derived primarily from equity, it is an abandonment, rather than an application, of a historical view of the seventh amendment to call such an action a "Suit at common law." Stated differently, even if one accepts the Court's current focus on substantive rights and remedies, there comes a point at which the changes in procedure have been so extensive that there has been a change in the substantive character of the action as well. When such a point is reached, an effort to distinguish cases on the basis of the rights asserted and the remedies sought seeks to preserve the right to a jury trial in what can no longer in any realistic sense be called a suit at common law. [Id. at 612-613]
This court does not mean to suggest that the right to a jury trial is limited to the constricted common law forms of action which existed in the late eighteenth century. As to trials in federal courts, it has been held that the right to a jury trial granted by the Seventh Amendment extends beyond such recognized common law forms of action. Curtis v. Loether, 415 U.S. 189, 193, 94 S.Ct. 1005, 1007, 39 L.Ed.2d 260, 265 (1974); Parsons v. Bedford, 28 U.S. (3 Pet.) 433, 446-447, 7 L.Ed. 732 (1830). In Curtis v. Loether, supra, the court stated:
... By common law, [the framers of the Seventh Amendment] meant ... not merely suits which the common law recognized among its old and settled *16 proceedings, but suits in which legal rights were to be ascertained in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered.... [415 U.S. at 193, 94 S.Ct. at 1008, 39 L.Ed.2d at 265]
Nor does this court find the instant case to be of an equitable nature so as to warrant denial of a jury trial. See Ross v. Bernhard, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970); Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); Beacon Theaters, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959).
However, it is the opinion of the court that the procedural problems alone in the case presently under consideration are so staggering as to render the case beyond the practical abilities of a jury to decide it knowledgeably. Therefore, it must be concluded that trial by jury must be denied. In so concluding, the court shares the distinguished company of Lord Patrick Devlin who wrote: "If the court denies trial by jury in any case in which it deems the `practical abilities' to be insufficient, the court will have history on its side." Devlin, "Jury Trial of Complex Cases: English Practice at the Time of the Seventh Amendment," 80 Columbia L.Rev. 43 (1980). The basis for the court's denial of trial by jury here is that because of its labyrinthine procedural aspects, this case is of a type unknown at common law. In arriving at this conclusion, the court is not called upon to express either its agreement or disagreement with the dicta from Longo, supra, Keiffer, supra, or Van Dissel, supra, to the effect that the complexity of a factual controversy or the lengthy trial that such controversy would require does not warrant deprivation of a trial by jury. However, it is significant that even in Ross v. Bernhard, supra, where the United States Supreme Court upheld the right of trial by jury, footnote ten declared that one of the tests of the "legal" [as opposed to "equitable"] nature of an issue is "the practical abilities and limitations of juries." It has already been mentioned above that the case now before this court is beyond the practical abilities of jurors. However, the complexity and length of trial that will no doubt be involved here do not stem *17 principally from the factual controversy or subject matter, but rather from the great array of litigants, crossclaims, third-party actions, and multiple issues. Such a case was not only unknown at common law, but was very likely even beyond the imagining of those who shaped the common law.
In an address to a meeting of a conference of state chief justices on August 7, 1979, Chief Justice Warren E. Burger urged a "new look" at the problems caused by trial by jury in complex litigation. After a discussion of misgivings expressed by Judge Jerome Frank as to the ability of juries to achieve just results, and by Professor Leon Green, see Green "Jury Trials and Mr. Justice Black," 65 Yale L.J. 482, 483-484 (1956). The Chief Justice stated:
We know that many years before England abolished juries in virtually all civil cases, English judges increasingly treated complex civil cases as cases in equity for trial without a jury. When the results of that practice came to be fully understood, England took the final step and in 1937 abolished juries in all civil cases except libel and fraud.
We need not go so far as Jerome Frank advocated or accept Professor Green's analysis  or go so far as England has gone to justify the need for a careful study of a more selective use of juries in certain categories of civil cases. It is enough for now that we inquire into the possibility of some alternatives to jury trial for the protracted trials of issues which baffle all but the rarest of jurors.
Chief Justice Burger also declared:
When the framers of the Constitution were engaged in the practice of law in the colonies, they were not dealing with the kinds of complex cases which are the daily fare of the courts in the second half of the twentieth century. The performance of those draftsmen in anticipating problems of the future and casting the Constitution in broad, flexible terms was extraordinary. But it would be asking too much to suggest that they should have anticipated today's litigation involving a host of new problems unknown to the lawyers of 1787. The change in litigation patterns in recent decades boggles the mind of man and numerous cases document this reality.
Having decided that the case before it is of a type unknown at common law and, therefore, does not carry with it the right to trial by jury, this court could terminate its discussion right here. However, there is an opinion, In re Japanese Electronic Products Antitrust Litigation, 631 F.2d 1069 (3 Cir.1980), which should also be carefully considered. In that *18 case, two United States corporations brought action against several Japanese competitors for treble damages under federal anti-trust and anti-dumping laws. Defendants moved to strike plaintiffs' demand for a jury trial, contending that the case was too complex for a jury. They argued that "the due process clause of the fifth amendment prohibits trial by jury of a suit that is too complex for a jury." Id. at 1084. In upholding this argument, the court stated:
Although no specific precedent exists for a finding a due process violation in the trial of any case to a jury, the principles that define the procedural requirements of due process would seem to impose some limitations on the range of cases that may be submitted to a jury.... [Ibid.]
The Third Circuit panel then discussed the conflict between the Fifth Amendment right to due process of the law and the Seventh Amendment right to trial by jury in civil cases. The court stated:
If a particular lawsuit is so complex that a jury cannot satisfy this requirement of due process but is nonetheless an action at law, we face a conflict between the requirements of the fifth and seventh amendments. In this situation, we must balance the constitutionally protected interest, as they are implicated in this particular context, and reach the most reasonable accommodation between the two constitutional provisions.... [Ibid.]
The Third Circuit then proceeded to balance the constitutionally protected interests, and found that the right to due process outweighs the right to trial by jury. Thus, the court pointed to the "danger" that an "erratic and completely unpredictable [verdict] ... would be inconsistent with even handed justice," and added that "[t]he loss of the right to jury trial in a suit found too complex for a jury does not implicate the same fundamental concerns." [Ibid.] Since the Third Circuit Court was dealing with a case instituted in a federal court, the due process guaranteed by the Fifth Amendment was involved. However, principles of substantive due process are also contained in Art. I, par. 1 of the New Jersey Constitution. Hutton Pk. Gardens v. West Orange Town Council, 68 N.J. 543, 560 (1975).
It should be added that this court is aware of In re U.S. Financial Securities Litigation, 609 F.2d 411 (9 Cir.1979), *19 cert. den. sub nom. Gant v. Union Bank, 446 U.S. 929, 100 S.Ct. 1866, 64 L.Ed.2d 281 (1980), in which the Ninth Circuit apparently disagreed with the holding of the Third Circuit in In re Japanese Electronic Products Antitrust Litigation, supra. However, although not bound by either precedent, see State v. Coleman, 46 N.J. 16, 36 (1965) cert. den. 383 U.S. 950, 86 S.Ct. 1210, 16 L.Ed.2d 212 (1966), this court finds that the Third Circuit case contains the more persuasive logic, and that its reasoning should be endorsed in the case now being considered. In Bernstein v. Universal Pictures, Inc., et al., 79 F.R.D. 59, (S.D.N.Y. 1978), a case in which an application to strike a jury demand was ultimately granted, the court stated that before a demand for jury should be denied on the ground of complexity, such as to render a case beyond the ability of a jury to decide, the possibility of a reference to a special master under the Federal Rules of Civil Procedure should be considered and rejected. However, whereas Rule 53, Fed.R.Civ.P. provides for the appointment of a special master in federal cases, such a mechanism is not readily available in New Jersey.
In order to demonstrate why this case will be too complicated and lengthy to be tried by a jury consonant with due process of law, it now becomes necessary to discuss in some detail the course that the trial will take. First, it will be necessary for plaintiffs to prove what toxic substances stored by the landfills caused the injuries or property damage allegedly suffered by plaintiffs. Concerning the landfill of the public entity, Township of Edison, the trier of fact must also consider pursuant to N.J.S.A. 59:4-2 whether the action or inaction of the township was "palpably unreasonable." See Brown v. Brown, 86 N.J. 565, 580 (1981). Next, plaintiffs will have to prove which generator produced which toxic substance, and which hauler transported same to the landfill. Furthermore, each of 106 plaintiffs must, in order to establish proximate cause, prove that his or her particular injury or property damage was caused by the substance in question.
*20 In Kenney, et als. v. Scientific, Inc., et als., supra, this court indicated that the privately owned landfills and the privately owned generators would be subject to absolute liability (assuming proximate cause) for injuries or property damage resulting from toxic wastes. However, negligence is not out of the case insofar as these privately owned landfills or generators are concerned due to the fact that punitive damages are being sought against them. Thus, a full exploration of the factual aspects relative to the negligence of each of the privately owned landfills and privately owned generators is concerned. As for the public entity generators, although absolute liability and punitive damages are precluded by N.J.S.A. 59:9-2b and -2c, they may be liable under N.J.S.A. 59:2-2 for negligent choice of landfill provided that upon completion of discovery, plaintiffs survive a motion for summary judgment under N.J.S.A. 59:2-3 which grants immunity to a public entity for the exercise of judgment or discretion. Furthermore, as explained in Kenney, et als. v. Scientific, Inc., et als., supra, the haulers may also be answerable in negligence based on their choice of landfill. Thus, the question of the negligence of each hauler will present factual issues.
As for damages, each of 106 plaintiffs must separately prove his or her damages, both as to property and injury to person, against those defendants against whom liability has been established. For reasons pointed out hereinabove, bifurcation as to damages is not feasible. Additionally, there are hundreds of crossclaims between defendants and a complicated third-party action involving 36 third-party defendants to be resolved.
It is because the trial will be of the kind which has just been described that this court stated above that its duration could be from six months to a year or more, exclusive of deliberations. It cannot reasonably be expected that persons who must make a living or who have other family obligations will be willing to devote so long a period of time to jury duty, especially since N.J.S.A. 22A:1-1 limits their compensation to five dollars a day and two cents a mile for mileage. Wholesale requests to be *21 excused would be made, and a sense of fairness would mandate the granting of such requests. Surely the libertarian framers of our federal and state Constitutions did not intend that in granting trial by jury to citizens involved in litigation, they would conscript other citizens as jurors so as to wrench them away from their pursuits and traumatize their lives. The mass excuses that would, therefore, be required to be granted would leave the court only with a jury panel composed of persons not well suited to deal with the complex case at hand. As stated in In re Japanese Electronic Products Antitrust Litigation, supra:
Our liberties are more secure when juridical decisionmakers proceed rationally, consistently with the law, and on the basis of evidence produced at trial. If the jury is unable to function in this manner, it has the capacity of becoming itself a tool of arbitrary and erratic judicial power. [631 Fed.2d at 1085]
In his address mentioned above, Chief Justice Burger said:
There is an enormous impact on the life of the individual who is asked to leave his or her private affairs, family or business, to devote five or even six days each week for months to a single case. This is quite different from being called from the farm, factory, or home for several weeks to decide simple negligence cases or claims of breach of contract. Such routine cases (even when tried by lawyers who may take twice as much time as ought to be taken) can be completed within days or, at most, weeks. The disruption to personal and family life and business or professional occupations in these routine cases is minimal. Moreover, this is an obligation of citizenship. But apart from all the other flaws, it borders on cruelty to draft people to sit for long periods trying to cope with issues largely beyond their grasp....
In Village of Wilsonville v. SCA Services, Inc., 86 Ill.2d 1, 55 Ill.Dec. 499, 426 N.E.2d 824 (Sup.Ct. 1983), the Illinois Supreme Court dealt with a case in which plaintiff sought to enjoin defendant-landfill's operation as a nuisance. Incidentally, that defendant is also among the alleged owners/operators of the Kin-Buc landfill, and one of the claims against the owners/operators is for nuisance. The following quotation of a fragment from the Illinois opinion should serve to illustrate merely one aspect of the kind of technical testimony which the finder of fact in the instant case will have to consider:
Permeability studies conducted before the site opened by John Mathes, a professional engineer hired by the defendant, indicate permeability results *22 ranging from 7.4 X 10-8 centimeters per second to 1.2 X 10-8 centimeters per second (cm/sec.). (The larger the negative exponent is, the less permeable the soil. E.g., a finding of 10-8 cm/sec. indicates that the soil is less permeable than would a reading of 10-4 cm/sec.) After the site opened, Mathes took permeability samples from or near the bottoms of the trenches that had been dug. His second set of results ranged from 1.4 X 10-7 cm/sec. to .9 X 10-7 cm/sec.
Dr. James Williams, an engineering geologist with the Missouri Geology and Land Survey, also made permeability findings on behalf of the defendant from samples taken from the site after it opened. Dr. Williams' results ranged from 7 X 10-6 cm/sec. to 1 X 10-7 cm/sec. Dr. Williams testified on cross-examination that the general permeability of the site is considered to be greater than 1 X 10-8 cm/sec. and that he would not expect the average permeability of the soil to be as low as that used for samples. [55 Ill.Dec. at 503-504, 426 N.E.2d at 828-829]
In addition to the procedural burdens of the instant case, the jurors would be expected to shoulder the oppressive weight of the kind of testimony quoted above from Village of Wilsonville. Even for a judge to absorb such testimony would be most difficult; for a jury to do so would be virtually impossible.
In the toxic waste case now before the court, since trial by jury will not be able to produce a fair and balanced result, the court feels impelled to protect the integrity of the judicial process by ordering that type of trial best designed to achieve justice, i.e., a trial by a judge without a jury. Otherwise, the judge would not be presiding over a fair trial, but over a game of juridical Russian roulette. Truism though it may be, it is the function of a judicial system to promote justice. The litigants urging jury trial should not be permitted to achieve a trial in which the attainment of justice is foredoomed to failure.
Additionally, a distinct advantage of a trial by a judge without a jury stems from the requirement of R. 1:7-4 that in civil actions tried without a jury, the judge shall make findings of fact. Because of the number of parties and issues, this will be a severe task for the trial judge. It will, however, tend to insure that the final result will be based upon a careful analysis and consideration of the evidence. The trial judge designated to preside over this case will be confronted by a formidable and *23 vexatious assignment. It is hoped that his hapless jurist will be excused from any other duties for as long as it might take, not only to hear the case, but to review all the evidence and compose findings of fact and conclusions of law pursuant to R. 1:7-4. He or she will be entitled to the deep appreciation of the court system.
In conclusion, comment should be made concerning the argument of some counsel that any determination of the issue of jury or non-jury trial is premature. The argument advanced by these counsel is that the issue should not be decided until a time close to trial because the case might become less complicated as a result of successful motions for summary judgments as discovery proceeds. The reason this court believes that the issue should be decided now is that a delay in this decision might result in a long delay of trial. In the event that leave to appeal the order implementing this opinion should be granted, almost two years might elapse before the appeal is decided by the Appellate Division and perhaps eventually by the Supreme Court. It is expected that while any such appeals are pending, the parties will be required to continue with discovery as heretofore directed and to make those motions which they wish. Because of the nature of this case, which is already almost a year and one-half old, a trial date will not be attained for approximately another two years. There is no good reason to produce even further delay by postponing the initiation of the appellate process until a trial date is near. Furthermore, in the unlikely event that as a result of summary judgments, the case will be so significantly simplified as to invalidate those reasons upon which the decision to eliminate jury trial has been based, this court can always entertain motions for reconsideration.
The motion to strike the demands for jury trial will be granted. Liaison counsel for the generators should submit an order accordingly.
NOTES
[1] The complaint also joined the State of New Jersey, the County of Middlesex, and the Township of Edison, charging improper inspection or licensing of the Kin-Buc landfill. Summary judgment has been granted in favor of the State of New Jersey and the County of Middlesex. Partial summary judgment has been granted in favor of the Township of Edison regarding its alleged inspection or licensing of Kin-Buc. See Kenney, et als. v. Scientific, Inc., et als., 204 N.J. Super. 228 (Law Div. 1985).